UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Kyle Allen Rusness,

        Plaintiff,

v.

Becker County and its Personnel, Vivian
Anderson, Josie Johnson, Matthew H. Johnson,
John Freeman, and Michele Clayson acting in
their individual capacities, and Todd Glander
and Paula Peterson acting in their individual
and official capacities,

        Defendants.

Case No. 18-cv-2256 (JNE/LIB)
ORDER

Plaintiff Kyle Allen Rusness was in custody at Becker County Jail ("BCJ") from
January 17, 2015, to February 3, 2015, at which time BCJ staff transported him to a
hospital. Mr. Rusness brings this action alleging five counts against Becker County and
its personnel under 42 U.S.C. § 1983 and Minnesota common law. Defendants move for
summary judgment on all counts. ECF No. 57. For the reasons stated below, summary
judgment for Defendants is granted on all five counts.

## BACKGROUND

The Court views the record in favor of the non-moving party, Mr. Rusness.
However, Mr. Rusness asserted several facts in his arguments without providing
evidentiary support. These facts were thus excluded.

## I.    Mr. Rusness's Treatment in BCJ Custody

Mr. Rusness entered BCJ custody on January 17, 2015. From January 17 to January 23, Mr. Rusness was a pretrial detainee. On January 23, Mr. Rusness was convicted of a probation violation and began serving a criminal sentence.

During this time, Sunnyside Care Center ("Sunnyside") provided nursing services to BCJ. Two Sunnyside nurses, Registered Nurse Tami Sweep and Licensed Practical Nurse Teresa Ullmer, were on site at BCJ two to three days each week.

Mr. Rusness's intake form states that his medical concerns consisted of MRSA, an infection in the mouth, a body rash, and heart issues. The form also states Mr. Rusness was taking the antibiotic Bactrim. After entering custody, Mr. Rusness submitted a Sick Call Request listing in detail various symptoms he had. These symptoms included heart pain, night sweats, bleeding and swollen gums, blurry vision, dizziness, and extreme fatigue.

Two days later, on January 19, Nurse Ullmer attempted to see Mr. Rusness pursuant to his Sick Call Request. Mr. Rusness refused to see her.

On January 20, Officer Paula Peterson wrote out an Incident Report concerning Mr. Rusness's Sick Call Request, his subsequent refusal to see the nurse, and his prescription for Bactrim.[1]

The next day Mr. Rusness submitted another Sick Call Request complaining of a headache, fever, vomiting, and "really bad" gums. Nelson Aff. Ex. 6, ECF No. 73. He

---

[1] When Mr. Rusness arrived at BCJ, he had three days of Bactrim left. He refused his last dose of Bactrim.

wrote that he needed a doctor. Nurse Sweep examined Mr. Rusness the same day and scheduled a dentist appointment for him on February 4, 2015.

Mr. Rusness submitted a third Sick Call Request on January 23 in which he requested a higher dose of ibuprofen until his dentist's appointment. Mr. Rusness wrote that his pain was severe.

While Officer Peterson was distributing medications on January 24, Mr. Rusness asked her to look at a sore on his thigh. Officer Peterson contacted Officers Vivian Anderson and John Freeman. Officers Anderson and Freeman arrived at Mr. Rusness's cell and examined his thigh. They decided to take Mr. Rusness to the Essentia Health walk in medical clinic.

Officer Freeman accompanied Mr. Rusness to the medical clinic where Mr. Rusness informed Physician's Assistant ("PA") Vonda Eidenschink of his symptoms. Mr. Rusness specifically told PA Eidenschink he had been experiencing bleeding. PA Eidenschink examined Mr. Rusness and diagnosed him with gingivitis and a skin infection. She prescribed him an oral rinse for the gingivitis and an antibiotic for the skin infection. PA Eidenschink also recommended that Mr. Rusness obtain a full physical exam from a family practice physician. Officer Freeman overheard the diagnoses and the treatment instructions. PA Eidenschink wrote these instructions on an Inmate Medical Report, which Officer Freeman put in the nurses' inbox at BCJ. Officer Peterson wrote an Incident Report documenting Mr. Rusness's complaints and the visit to the medical clinic.

The very next day Officer Christopher Burton submitted a Sick Call Request on Mr. Rusness's behalf, noting "there [were] still some issues" with Mr. Rusness. Nelson Aff. Ex. 14, ECF No. 73. Officer Burton also wrote that Mr. Rusness's symptoms were getting worse. Mr. Rusness himself submitted a Sick Call Request as well. Mr. Rusness complained that his throat was closing, he was unable to gargle the prescribed oral rinse, and he had difficulty consuming food or fluid. Later in the day, Mr. Rusness's aunt visited him. He told her, "I think it's serious, that's – they think it's serious. You know, [certain jailers] come and check on me all the time, make sure I'm doing okay. And they have sympathy, they're waiting for somebody to let me go see a medical physician." Yunker Decl. Ex. 2, Rusness Dep. at 140:5-143:21, ECF No. 60.

On January 26, Nurse Ullmer reviewed several of Mr. Rusness's Sick Call Requests and PA Eidenschink's Inmate Medical Report. She did not have access to PA Eidenschink's Examination Note. Nurse Ullmer thus knew Mr. Rusness had been to the medical clinic and had been prescribed an oral rinse and antibiotic, but she did not know Mr. Rusness's diagnoses of gingivitis and a skin infection when she met with him that day. During the visit, Nurse Ullmer took down Mr. Rusness's complaints including bleeding from the nose and mouth, a blood spot in his eye, and vomiting. Mr. Rusness told Nurse Ullmer that he needed to go to the emergency room. Nurse Ullmer also wrote that Mr. Rusness stated he could barely talk, but she had to interrupt him to ask her questions. Nurse Ullmer did not examine Mr. Rusness's nose or mouth during the visit.

Following the visit, Nurse Ullmer made an appointment for Mr. Rusness to see a family practice physician on February 3, 2015. She also made Tylenol available to Mr.

Rusness as needed. Nurse Ullmer wrote in the Nurse Logbook that Mr. Rusness was continuing his antibiotic and mouth rinse and that she had scheduled a doctor's appointment for him. She instructed BCJ staff to report if Mr. Rusness was bleeding or vomiting.

Nurse Ullmer relayed this information to Officer Peterson who wrote out an Incident Report. The Incident Report states, "The nurse does have some concerns but until [Mr. Rusness] is on the antibiotic for longer and the antibiotic starts working there is no reason for a follow-up with a doctor." Nelson Aff. Ex. 19, ECF No. 73. Nurse Ullmer testified at her deposition that she believed Mr. Rusness had "no current symptoms that would trigger following up with a doctor at [this] time . . . ." Nelson Aff. Ex. 4, Ullmer Dep. at 101:21-102:18, ECF No. 73.

The next day, January 27, Officer Matthew Johnson performed an early morning well-being check. He found Mr. Rusness standing at the door of his cell. Mr. Rusness explained that he had been bleeding from his nose and mouth. Mr. Rusness then showed Officer Matthew Johnson a cup filled with about three ounces of blood. Officer Matthew Johnson could not see a source of the bleeding.

About two hours later, Officer Josie Johnson spoke with Mr. Rusness while she was distributing medications. Mr. Rusness declined his pain medications. At this time Officer Josie Johnson noticed some watered-down blood near Mr. Rusness. Officer Josie Johnson had looked at the Nurse Logbook prior to distributing medications and did not believe the situation was serious. However, she did call Officer Freeman to Mr. Rusness's cell.

Both Officers Freeman and Anderson arrived at Mr. Rusness's cell. At this time, they were aware that Mr. Rusness was diagnosed with gingivitis. They saw blood on the sheets and walls. They also saw bloody saliva in a cup near Mr. Rusness's bed. Officer Freeman took several photographs of the scene as Mr. Rusness watched from the bed. Officers Freeman and Anderson then took Mr. Rusness in a wheelchair to a medical observation cell. Officer Freeman took Mr. Rusness's temperature, which was 99.9 degrees. Jail staff monitored Mr. Rusness on camera and conducted well-being checks every thirty minutes. Both Officers Freeman and Anderson checked in on Mr. Rusness during the medical observation. They took his temperature again, which remained at 99.9 degrees. On one occasion while Mr. Rusness was sleeping, Officer Anderson noted Mr. Rusness's drool was tinged with blood.

At some point during this time, Officer Anderson reviewed Mr. Rusness's file. She found that Mr. Rusness had recently been to the medical clinic and that the nurse recommended waiting for his antibiotic to take effect before following up with a doctor. Officer Anderson, either herself or via another member of BCJ staff, contacted a nurse at Sunnyside. Nelson Aff. Ex. 20, Anderson Dep. 54:24-55:2, ECF No. 73. The nurse instructed BCJ staff to keep monitoring Mr. Rusness.[2] *Id*. at 52:13-53:12. Officer Freeman wrote a note detailing the situation and put it on a desk at the nurses' office in

---

[2] Mr. Rusness complains that Defendants have not produced a document confirming this call was made. However, Mr. Rusness offers no affirmative evidence to rebut Officer Anderson's testimony.

accordance with Nurse Ullmer's instructions in the Nurse Logbook. However, Nurse Ullmer testified that she was not made aware of this event.

BCJ staff moved Mr. Rusness out of medical observation the next day, January 28. Mr. Rusness's aunt visited him that evening and Mr. Rusness told her about the bleeding incident. Yunker Decl. Ex. 2, Rusness Dep. 172:21-176:4, ECF No. 60. He added that he "barely remembered what happened." *Id.*

On January 31, Officer Freeman spoke with Mr. Rusness when he was distributing medications. Mr. Rusness called out from his bed, asking for his medication. Officer Freeman told Mr. Rusness to come to the cart. Mr. Rusness replied that as Officer Freeman could see, he had "been moving slow for the last two weeks." Nelson Aff. Ex. 24, ECF No. 73. Mr. Rusness then crawled ten to fifteen feet to the medication cart. Once at the cart, Mr. Rusness stood up, took his medication, and walked normally.

Mr. Rusness also spoke with Officer Michele Clayson while she was distributing medications on February 1. Mr. Rusness told her that his leg was numb. Officer Clayson noted that Mr. Rusness was walking normally on it. Mr. Rusness replied that his leg and his arms were numb. Officer Clayson told Mr. Rusness that he could obtain a Sick Call Request form. She testified that Mr. Rusness did not seem in distress at this time. Mr. Rusness subsequently filled out a Sick Call Request. He stated that his symptoms were worsening and that he had discontinued his antibiotic because it was causing him to vomit. He also stated that he had not left bed in a week and was experiencing great pain. Officer Peterson later filed an Incident Report detailing Mr. Rusness's Sick Call Request and his cessation of his antibiotic.

Nurse Ullmer met with Mr. Rusness the next day, on February 2. She took his temperature, which was 100.00 degrees. Nurse Ullmer then called a dentist concerning Mr. Rusness's condition. The dentist told her to continue Mr. Rusness on his antibiotic and explained that Mr. Rusness's bleeding could be caused by use of methamphetamine, extended time on antibiotics, a wisdom tooth issue, or a general body infection. Nurse Ullmer recorded the dentist's advice in the Nurse Logbook. She wrote that Mr. Rusness had a doctor's appointment the next day and a dentist's appointment the day after that. Nurse Ullmer also instructed BCJ staff to report if Mr. Rusness's temperature rose above 100.00 degrees.

Later in the day, Officer Matthew Johnson moved Mr. Rusness to a medical observation cell.

Though Mr. Rusness's doctor's appointment was scheduled for February 3, Officer Freeman took Mr. Rusness to the emergency room at Essentia hospital the morning of February 3 instead of waiting for the appointment. While waiting for the car to transport Mr. Rusness to the hospital, Officer Freeman noticed Mr. Rusness was not walking normally. Mr. Rusness fell on his knee, got back up, and fell again before getting into the car.

## II.     Mr. Rusness's Subsequent Diagnosis and Current Condition

Mr. Rusness presented to Essentia hospital with a platelet level at 4,000 and a hemoglobin level at 2.7. The doctors gave Mr. Rusness two units of blood and performed what would be the first of three CT scans. A doctor reading the scan did not see any brain bleeding, but a radiologist found the scan showed a "tiny subarachnoid hemorrhage" in

the right temporal area of Mr. Rusness's brain. Nelson Aff. Ex. 31, ECF No. 73. Mr. Rusness's doctors diagnosed him with severe anemia, thrombocytopenia, and a subarachnoid hemorrhage before transporting him via air lift to Sanford Medical Center in Fargo, North Dakota. Mr. Rusness received two more units of blood en route.

At Sanford, Mr. Rusness underwent a second CT scan. This scan showed an "additional area of high density of the subarachnoid space." *Id*. A few hours later doctors performed a third CT scan. This scan showed "patchy subarachnoid" hemorrhaging present at "multifocal regions of both cerebrum." *Id.*

Mr. Rusness was ultimately diagnosed with acute myeloid leukemia. As of March 2018, Mr. Rusness has been in complete remission. However, he suffers two permanent conditions. First, Mr. Rusness's brain bleeding led to a permanent "gray cloud" in the periphery of his left eye. Nelson Aff. Ex. 37, ECF No. 73. Second, Mr. Rusness suffers from Post-Traumatic Stress Disorder.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When analyzing a summary judgment motion, "facts must be viewed in the light most favorable to the nonmoving party," but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). To survive a defendant's motion for summary judgment, the plaintiff must present "sufficient probative evidence that would permit a finding in his favor without resort to speculation, conjecture, or fantasy." *Reed v. City of St. Charles*, 561 F.3d 788,

790-91 (8th Cir. 2009) (internal quotations and citations omitted). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." *Thomas v. Corwin*, 483 F.3d 516, 526-27 (8th Cir. 2007).

## ANALYSIS

Mr. Rusness asserts four claims under 42 U.S.C. § 1983 as well as a negligence claim under Minnesota common law. Defendants move for summary judgment on all claims. The parties disagree over the admissibility of Mr. Rusness's expert's opinion.

### I.      Admissibility of Dr. Hellerstein's Opinion

In their reply to Mr. Rusness's response to their Motion for Summary Judgment, Defendants argue that Dr. Hellerstein's report is inadmissible. Defendants first argue that the report does not "help the trier of fact" as required by Federal Rule of Evidence 702(a). Federal Rule of Evidence 702 provides that a qualified expert may give their opinion if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Expert testimony "within the knowledge or experience of the jury" does not meet the 702(a) requirement and is properly excluded. *United States v. Arenal*, 768 F.2d 263, 269 (8th Cir. 1985). Here, Dr. Hellerstein's report repeatedly states that "even . . . a lay person" would recognize Mr. Rusness's symptoms were serious. Nelson Aff. Ex. 34, at 2,

6-7, 7, 8, ECF No. 73. The jurors represent the lay perspective. After the parties present evidence on Mr. Rusness's symptoms, the jurors can determine for themselves how serious the symptoms appeared. Therefore, the Court excludes from consideration the portions of Dr. Hellerstein's report concerning what a lay person would conclude.

Defendants also argue that Dr. Hellerstein's opinion that earlier treatment would have prevented bleeding in Mr. Rusness's brain should be excluded because it is outside Dr. Hellerstein's expertise. Dr. Hellerstein's expertise includes internal and emergency medicine. At this stage in the litigation, the Court is satisfied that Dr. Hellerstein is qualified to give this opinion.[3]

## II.    Section 1983 Claims

A plaintiff pursuing a § 1983 claim must show that the defendant acted under the color of state law and deprived him of a right, privilege, or immunity secured by the Constitution or laws of the United States. 42 U.S.C. § 1983; *Hott v. Hennepin County*, 260 F.3d 901, 905 (8th Cir. 2001) (citing *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986)). Mr. Rusness alleges violations of the Eighth and Fourteenth Amendments. The Eighth Amendment applies only to convicted prisoners, but the Fourteenth Amendment provides Eighth Amendment protections to pre-trial detainees. *Id.* Mr. Rusness's change in status from a pretrial detainee to a convicted prisoner thus makes "little difference as a practical matter." *McRaven v. Sanders*, 577 F.3d 974, 979 (8th Cir. 2009).

---

[3] Defendants further argued that Dr. Hellerstein's report should not be considered to the extent it refers to a full cup of blood on January 27. Mr. Rusness's counsel made clear at oral argument that Dr. Hellerstein's phrase "cup of blood" was referring to a cup with some blood in it, and not a full cup of blood.

## A. Deliberate Indifference to Medical Needs

Mr. Rusness claims in count one that Officers Paula Peterson,[4] John Freeman, Vivian Anderson, Josie Johnson, Matthew Johnson, and Michele Clayson were deliberately indifferent to his medical needs in violation of the Eighth and Fourteenth Amendments. A government official violates an inmate's constitutional rights if they are deliberately indifferent to the inmate's medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). Intentionally delaying medical treatment constitutes deliberate indifference. *Id.* A deliberate indifference claim contains an objective and a subjective requirement. To prove a deliberate indifference claim, Mr. Rusness must show, "(1) he suffered from an objectively serious medical need, and (2) defendants knew of the need yet deliberately disregarded it." *Johnson v. Leonard*, 929 F.3d 569, 575 (8th Cir. 2019).

The Officer Defendants argue they are entitled to qualified immunity. Qualified immunity shields state actors from civil liability. *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* at 12 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). To survive qualified immunity, Mr. Rusness must meet a two-part test. First, Mr. Rusness must show that the facts, viewed in the light most favorable to him, demonstrate Defendants violated one of his constitutional or statutory rights. *Howard v. Kan. City Police Dep't*, 570 F.3d 984, 988 (8th Cir. 2009). Second, Mr. Rusness must show the right was clearly established at the time of the violation. *Id.* Courts have discretion to

---

[4] Paula Peterson is now a jail administrator, but was a corrections officer while Mr. Rusness was in BCJ custody. Yunker Decl. Ex. 3, Peterson Dep. 19:2-19:18, ECF No. 60.

decide the order in which to address the two-part test. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). When determining the appropriate order of analysis, courts should avoid the "substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case." *Id*. at 236-37.

Here, the Court considers whether the right allegedly violated was clearly established because it is dispositive. The Eighth Circuit takes a "broad view" of clearly established law, allowing courts to consider "all available decisional law, including decisions of state courts, other circuits and district courts." *Buckley v. Rogerson*, 133 F.3d 1125, 1129 (8th Cir. 1998). Nonetheless, to show the right at issue was clearly established a plaintiff still must identify precedent with close factual correspondence to the case at hand. *Anderson v. Creighton*, 483 U.S. 635, 639-41 (1987); *Mullenix*, 577 U.S. at 12 (stating the analysis requires considering the "particular conduct" and the "specific context"). In *Ivey v. Audrain County*, the Eighth Circuit found a district court had defined the right at issue too broadly when it said, "it is unlawful to delay medical treatment for a detainee exhibiting obvious signs of medical distress." 968 F.3d 845, 849 (8th Cir. 2020). Instead, the Eighth Circuit found the officer defendants were entitled to qualified immunity because the law did not clearly establish what officers must do where a detainee declined medical assistance but exhibited symptoms like vomiting, loss of bowel control, and seizure-like movements. *Id*. at 849-50.

Here, Mr. Rusness asserts it was clearly established that "an intentional delay in obtaining medical care for an inmate could give rise to a violation." Pl.'s Mem. Opposing

Summ. J. 29, ECF No. 74. While this assertion is correct, it is too general to surmount qualified immunity. *Ivey*, 968 F.3d at 849-50.

During oral argument, Mr. Rusness put forward three additional cases to show that the Officer Defendants violated clearly established law: *Foulks v. Cole County*, 991 F.2d 454 (8th Cir. 1993); *Hinson vs. Huskins*, Case No. 08-5072, 2010 WL 2199766 (W.D. Ark. May 26, 2010); and *Hartsfield v. Colburn*, 371 F.3d 454 (8th Cir. 2004). However, these cases are distinguishable. Unlike the defendants in *Foulks*, the Officer Defendants here adhered to the instructions of medical professionals. Unlike the plaintiffs in *Hinson* and *Hartsfield*, Mr. Rusness repeatedly received medical treatment during the two and half weeks he was in custody at BCJ. In *Hinson* and *Hartsfield*, the defendants withheld medical treatment for months. *Hinson*, 2010 WL 2199766, at *13; *Hartsfield*, 371 F.3d at 457. Because Mr. Rusness has not demonstrated that the Officer Defendants violated clearly established law, the Officer Defendants are entitled to qualified immunity. Summary judgment for Defendants is granted on count one.

### B. Failure to Provide Adequate Training

In count two Mr. Rusness claims that Becker County is liable under § 1983 for failing to provide adequate training to corrections officers. Mr. Rusness alleges that Sheriff Todd Glander and Officer Randy Hodgson[5] failed to properly train staff on a policy related to reviewing inmates' files, failed to train staff to appropriately respond to inmates' medical needs, and failed to train staff on a rule requiring written reports for incidents resulting in hospitalization. Pl.'s Mem. Opposing Summ. J. 32-35, ECF No. 74.

---

[5] Mr. Rusness did not name Officer Hodgson as a defendant in this case.

"[A] municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). To survive a motion for summary judgment, Mr. Rusness must provide evidence that Becker County "was on notice that its training procedures were inadequate and likely to result in a violation of constitutional rights." *Larkin v. St. Louis. Hous. Auth.*, 355 F.3d 1114, 1117 (8th Cir. 2004) (internal quotations and citations omitted). There are two ways to show the county was on notice. *Id.* Mr. Rusness could show "the need for training is patently obvious" or Mr. Rusness could show a pattern of misconduct indicating Becker County's training was inadequate. *Id.*

Here, Mr. Rusness does not argue and puts forward no evidence suggesting Becker County was on notice its training procedures were inadequate. Mr. Rusness does not counter Defendants' evidence that a court dismissed the only deliberate indifference lawsuit against Becker County in recent years. *See Bevins v. Becker County*, No. 16-CV-4340, 2019 WL 397322 (D. Minn. Jan. 31, 2019). Nor does Mr. Rusness provide any other evidence of a pattern of misconduct that would place Becker County on notice its training procedures were likely to result in constitutional violations. Because Mr. Rusness has not provided sufficient evidence of an essential element of his failure to train claim, summary judgment is proper on count two.

### C. Enacting Unconstitutional Policies, Customs, and Practices

Mr. Rusness also claims that Becker County is liable under § 1983 in count three for enacting unconstitutional policies, customs, and practices. Because Mr. Rusness points out policies without arguing they are unconstitutional, presumably Mr. Rusness is

arguing that Becker County has an unconstitutional custom or practice of ignoring those policies. Pl.'s Mem. Opposing Summ. J. 32-35, ECF No. 74. There are three elements in such a claim. *Mick v. Raines*, 883 F.3d 1075, 1079-80 (8th Cir. 2018).

> A plaintiff may establish municipal liability through an unofficial custom of the municipality by demonstrating (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation. *Id.* (citing *Corwin v. City of Independence*, 829 F.3d 695, 700 (8th Cir. 2016).

Assuming without deciding that Mr. Rusness has established a genuine issue of material fact on the first element, Mr. Rusness nevertheless fails on the second. Mr. Rusness does not allege that Sheriff Glander or Officer Hodgson are Becker County policymaking officials and puts forward no evidence that Becker County policymaking officials had notice of any misconduct. Therefore, summary judgment is granted on count three.

### D. Failure to Provide Adequate Supervision

In count five Mr. Rusness alleges that Sheriff Glander and Officer Peterson are liable for failing to provide adequate supervision to BCJ staff.

> "When a supervising official who had no direct participation in an alleged constitutional violation is sued for failure to train or supervise the offending actor, the supervisor is entitled to qualified immunity unless plaintiff proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts." *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015) (citing *Livers v. Schenck*, 700 F.3d 340, 355 (8th Cir. 2012)).

Mr. Rusness does not allege that Sheriff Glander directly participated in delaying his medical care. Mr. Rusness has put forward no evidence suggesting Sheriff Glander had notice of a pattern of unconstitutional acts or that he was deliberately indifferent to those acts. Therefore, Sheriff Glander is entitled to qualified immunity.

Mr. Rusness does allege Officer Peterson directly participated in delaying his medical care. However, Officer Peterson only became a supervisor in the fall of 2015. Yunker Decl. Ex. 3, Peterson Dep. 19:2-19:18, ECF No. 60. "Government officials are personally liable only for their own misconduct." *Krigbaum*, 808 F.3d at 340 (citing *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010)). Because Officer Peterson was not a supervisor while Mr. Rusness was in custody at BCJ, she cannot be liable under a failure to supervise theory. Summary judgment is granted on count five.

## III.    Negligence

Mr. Rusness claims in count four that "all defendants" were negligent under Minnesota common law. To establish a negligence claim, Mr. Rusness must show (1) the defendants owed him a duty of care; (2) the defendants breached the duty of care; (3) the breach caused him to suffer an injury; and (4) he actually suffered an injury. *Lubbers v. Anderson*, 539 N.W.2d 398, 401 (Minn. 1995). Jailers owe an affirmative duty of care to detainees and inmates. *Sandborg v. Blue Earth County*, 615 N.W.2d 61, 64 (Minn. 2000).

Defendants argue that they are entitled to official immunity under Minnesota law. Defendants also argue that Mr. Rusness did not provide sufficient evidence of his negligence claim to survive summary judgment. Mr. Rusness argues that official immunity does not apply. He states that Defendants had three specific duties here: a duty

to document his medical problems; a duty to review his medical file; and a duty to respond to his requests for medical attention. Pl.'s Mem. Opposing Summ. J. 31, ECF No. 74. Mr. Rusness does not explicitly address the other elements of the negligence claim in his responsive brief.

Official immunity shields government officials from state law claims. *Johnson v. Morris*, 453 N.W.2d 31, 41 (Minn. 1990). Two steps are necessary to determine if official immunity applies. *Dokman v. County of Hennepin*, 637 N.W.2d 286, 296 (Minn. Ct. App. 2001).

First, the Court must determine if the actions at issue were discretionary. *Id*. If the actions were discretionary, official immunity applies. *Id*. If the actions were ministerial, the government official is not immune from suit. *Id*. In *Dokman*, a decision regarding an inmate's suicide threat was discretionary because officers were responding to the information they had, the circumstances were tense and uncertain, the situation was necessarily unique, and the decision required judgment. *Id*. Conversely, in *Gordon v. Frank*, the defendant officers' decisions and the defendant sergeant's decision were ministerial. 454 F.3d 858, 865 (8th Cir. 2006). The defendant officers decided against immediately notifying a sergeant to the plaintiff's medical incident and the defendant sergeant chose not to assess the situation despite the County Sheriff's policy explicitly requiring these "simple and definite tasks." *Id*. A written policy makes an action ministerial if it "creates a sufficiently narrow standard of conduct that the employees feel bound to follow." *Id*. (internal quotations and citations omitted). Still, the court in *Gordon* noted that even though the defendant sergeant's decision not to assess the

plaintiff was ministerial, the defendant sergeant would have had discretion while making the assessment. *Id.*

Second, the Court must decide if Defendants' acts were malicious. *Dokman*, 637 N.W.2d at 296. If Defendants acted with malice, they are not immune from suit. *Id.* Malice is the "willful violation of a known right." *Id.* (quoting *Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991)). In *Rico*, official immunity was proper where the plaintiff did not provide any facts showing the defendant knew or had reason to know the action was proscribed at the time. 472 N.W.2d at 109. The court also reasoned that the defendants could not commit a willful or malicious wrong because there was no clearly established law or regulation to put them on notice the challenged conduct was prohibited. *Id.* at 107.

The heart of Mr. Rusness's case concerns what he labels as Defendants' duty to respond to his requests for medical attention. The Court finds Defendants' responses were discretionary. Like the officers in *Dokman*, Defendants here handled a necessarily unique situation that required them to exercise their judgment and determine how to best respond. 637 N.W.2d at 296. Deciding whether to bring Mr. Rusness to a hospital was not a "definite and simple" task. *Gordon*, 454 F.3d at 865. Instead it is like the defendant sergeant's assessment in *Gordon*, which would have been discretionary had he made it. *Id.* The Court also finds that Defendants' responses were not malicious as a matter of law. Mr. Rusness argues that he pled facts in his complaint "that indicate that the actions were done willfully." Pl.'s Mem. Opposing Summ. J. 32, ECF No. 74. There are two problems with this assertion. First, allegations in the complaint are insufficient at the summary judgment stage of litigation. *Thomas*, 483 F.3d at 526-27. Second, "the willful

or malicious wrong exception to official immunity contemplates something more" than willful or intentional acts. *Rico*, 472 N.W.2d at 107. "The defendant must have reason to know that the challenged conduct is prohibited." *Id.* Mr. Rusness has not demonstrated that Defendants had reason to know their responses were prohibited.

The remaining two duties that Mr. Rusness asserts, the duty to document his medical problems and the duty to review his medical file, may be ministerial. However, even if these duties exist, summary judgment is proper because Mr. Rusness has not presented sufficient evidence on which a jury could return a verdict in his favor. *Reed*, 561 F.3d at 790-91; *see also Lubbers*, 539 N.W.2d at 401 (affirming summary judgment where the plaintiffs "failed to present specific facts giving rise to a genuine issue for trial as to the causal connection" between the alleged negligence and their injuries).

Mr. Rusness has not provided sufficient evidence of causation, namely that he would have been brought to a doctor earlier, and correctly diagnosed earlier, had the Officer Defendants documented his medical needs and reviewed his file. Mr. Rusness states that he "has pleaded facts that plausibly support a conclusion that the Defendants' actions were ministerial." Pl.'s Mem. Opposing Summ. J. 32, ECF No. 74. Yet, an allegation in the pleadings cannot amount to a genuine issue of material fact at summary judgment. *Thomas*, 483 F.3d at 526–27. Furthermore, Mr. Rusness must do more than show official immunity does not apply. Mr. Rusness must present evidence on which a jury could find in his favor on the claim. *Reed*, 561 F.3d at 790-91.

In a different section of his brief, Mr. Rusness argues that if the Officer Defendants had read his file:

> "[I]t is likely that they would have discovered, among other things, the Sick Request Call forms Rusness had submitted from the very beginning of his custody period, and would have been more aware of his deteriorating and serious medical condition." Pl.'s Mem. Opposing Summ. J. 34, ECF No. 74.

However, Mr. Rusness cites no evidence that had Defendants been more aware, they would have taken Mr. Rusness to a doctor again before February 3. Indeed Mr. Rusness argues earlier in his brief that Officer Anderson was deliberately indifferent to his medical needs because she had reviewed Mr. Rusness's file, knew his medical issues, and still chose not to transport Mr. Rusness to the hospital. [6] *Id.* at 21-23. Mr. Rusness also argues that Officer Paula Peterson was deliberately indifferent because she did not arrange for him to be taken to the hospital despite the fact she was "apprised of Rusness' medical needs from the beginning of his incarceration." *Id.* at 24. According to Mr. Rusness's own brief, Officers Anderson and Peterson knew all of Mr. Rusness's medical needs and did not take Mr. Rusness to a doctor in the relevant time period. Even assuming the other Defendants breached the duty to document and the duty to review Mr. Rusness's file, there is no evidence to suggest that had they known all of the information, they would have taken Mr. Rusness to a doctor a second time before February 3. Officer Anderson did not know the seriousness of Mr. Rusness's condition even with all of the information she had. Nelson Aff. Ex. 20, Anderson Dep. 58:9-58:14, ECF No. 73.

---

[6] This also means Officer Anderson could not have breached the duty to review Mr. Rusness's file.

Moreover, Mr. Rusness had been to a medical clinic on January 24 and had a doctor's appointment scheduled on February 3.

Mr. Rusness cannot overcome Defendants' official immunity for their discretionary duty to respond to Mr. Rusness's medical needs. Mr. Rusness has not provided sufficient evidence that breach of the remaining duties caused his injuries. Thus, Defendants are entitled to summary judgment on count four.

## CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1.      Defendants' Motion for Summary Judgment [ECF No. 57] is GRANTED.

2.      Counts 1, 2, 3, 4, and 5 are DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: January 7, 2021

s/ Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge